CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6840
    FAX: (415) 436-7234
    Email: kevin.barry@usdoj.gov

Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>JOSHUA PITTMAN,<br><br>    Defendant. | Case No. 24-CR-0592 JSW<br>Case No. 21-CR-0251 JSW<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Hearing Date: January 27, 2026<br>Hearing Time: 1:00 PM<br><br>Hon. Jeffrey S. White |

## INTRODUCTION

The defendant, Joshua Pittman, stands before the Court following his guilty plea to the single Count of the captioned Indictment charging him with being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1). The defendant also admitted the same conduct in Charge Six of the Form 12 in related case No. 21-CR-0251 JSW. The government submits this sentencing memorandum to inform the Court that it has no objections to the Presentence Report and to recommend that the Court sentence Defendant to a term at the high end of the Guidelines range for the offense of conviction, or 57 months, followed by a consecutive term of 24 months for the supervised release violation, for a total of 81 months, followed by three years of supervised release.

UNITED STATES' SENTENCING MEMO        1
24-CR-0592 JSW; 21-CR-0251 JSW

The government also submits that in addition to the Guidelines range for the offense charged in the Indictment and the Form 12, the Court can consider conduct that occurred five days earlier in determining an appropriate sentence. Specifically, the Court can consider whether the Defendant is responsible for a homicide in Oakland on June 23, 2024, as detailed in the Presentence Report. PSR ¶¶ 13-14.

**DEFENDANT'S OFFENSE CONDUCT**

On June 28, 2024, San Francisco Police Department officers assigned to the Community Violence Reduction Team were conducting surveillance on Defendant Pittman. The Defendant was wanted for a federal probation violation warrant issued by the District Court for the Eastern District of California. The officers knew that there was an active arrest warrant for Pittman, and they knew that he was serving a term of supervised release with a condition that he was subject to a warrantless search by any law enforcement officer.

The supervised release term arose from the Defendant's conviction for a Section 922(g)(1) violation before this Court, Case No. 21-CR-0251 JSW (NDCA). In May 2024, jurisdiction over Pittman's supervised release was transferred to EDCA, Case No. 24-CR-0126 DJC (EDCA). On June 10, 2024, the district court in EDCA issued a Form 12 and a warrant alleging several violations, such as failure to follow the Probation Officer's directions, failure to participate in drug testing and counseling, and unauthorized travel. *See id*. Dkt. 5 (July 8, 2024 Form 12 that includes charges from the June 28, 2024 arrest and charges from an earlier Form 12 that is not on the public docket).

The United States Probation Office in EDCA informed SFPD/CVRT officers that the Defendant worked at "Pierre Pierre" located at 401 13th Street in Oakland. On June 28, 2024, officers observed him at that location and saw that he had a cross-body bag draped over his shoulder.

Shortly before his arrest, the Defendant entered the driver's seat of a gray Tesla parked in front of Pierre Pierre. He got into the vehicle with another person who was later identified as Marquis Parker, a Page Street gang member. Officers then moved in to arrest the Defendant, and as they did so, he tossed the cross-body bag into the backseat of the Tesla. Officers seized the bag and found a Glock 22 pistol loaded with a high-capacity magazine inside.

The SFPD Crime Lab conducted a DNA comparison between the Defendant's DNA and DNA

swabs taken from the Glock 22 and unfired ammunition loaded in its magazine.  The analysis concluded that the DNA found on the Glock grips supported inclusion for Pittman's DNA.  The likelihood ratio was "452 nonillion," which constitutes "very strong support" for the proposition that the DNA found on the swabs from the Glock included DNA from the Defendant.  With respect to the unfired .40 caliber ammunition, the DNA lab concluded the DNA found on the ammunition also supported inclusion for the Defendant's DNA.  The likelihood ratio was "145 nonillion," which is also "very strong support."

## SENTENCING GUIDELINES CALCULATION

The base offense level provided in the PSR is 20, which applies to a defendant who was a prohibited person at the time of the offense and who possessed a firearm with a large capacity magazine. U.S.S.G. § 2K2.1(a)(4)(B).

| | | | |
|---|---|---|---|
| a. | Base Offense Level: (U.S.S.G. § 2K2.1(a)(4)(B)) (Prohibited Person / large capacity magazine) | | 20 |
| b. | Acceptance of Responsibility: (U.S.S.G. § 3E1.1(a),(b)) | | -3 |
| c. | Adjusted Offense Level: | | 17 |

The Probation Officer correctly determined that Defendant merits a criminal history calculation of V, as he has a host of prior felony convictions and was on supervised release at the time of the offense.  PSR ¶¶ 33-39.  With an adjusted offense level of 17, this results in a range of 46-57 months.

As the Form 12 indicates, the Guidelines range for the supervised release violation is 24-30 months, with a statutory maximum of 24 months.  Case No. 24-CR-0126 DJC (EDCA), Dkt. 5 at 10.

## SECTION 3553(A) FACTORS

The factors listed under 18 U.S.C. § 3553(a) direct the Court to impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing.  *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The key factors in this case are the nature and circumstances of the offense and the history and characteristics of the defendant, 3553(a)(1), and the need for deterrence, 3553(a)(2)(B).  These factors indicate that a sentence at the high end of the Guidelines range, or 57 months, followed by 24 months for the supervised release violation, is appropriate in this case, should the Court limit its consideration to the charged conduct.

With respect to the Defendant's history and characteristics, Defendant Pittman has an extensive criminal record. From 2011 through 2020, he spent little time out of custody before being arrested for crimes such as murder (four counts), assault for a firearm on a person, child abuse with great bodily injury or death likely, and other crimes. PSR ¶¶ 33-52. During that period, the Defendant was also convicted of multiple felonies, including first degree residential burglary, accessory after the fact, and witness intimidation, and he spent most of that time incarcerated. PSR ¶¶ 33-35.

In 2020, the Defendant came before this Court on a felon-in-possession of a firearm charge. This offense took place while he was on parole after a term of nearly 13 years in prison. He was paroled in April 2020, and he was arrested with a firearm in August 2020, just four months later. PSR ¶¶ 35-36. The defendant received a sentence of 42 months for that conviction, and in this case, he committed the very same crime while under judicial supervision. The Defendant's supervised release for the 2020 conviction began in December 2023, and he was arrested in June 2024, just seven months later. *See* Case No. 24-CR-0126 DJC (EDCA), Dkt. 5 at 1.

The current conviction represents at least the fifth adult felony the Defendant has earned, or his eighth if the Court counts the multiple felonies for which he was convicted in 2020. In fact, Defendant has multiple firearms priors. In addition to the 2020 Section 922(g)(1) conviction, the Defendant's first adult felony was for shooting into a residence with gross negligence. PSR ¶ 33.

For the Section 922(g)(1) prior, the Court sentenced Defendant to a term of 42 months in custody. PSR ¶ 44. That was not enough. Indeed, a prior prison term of 13 years was insufficient deterrence. PSR ¶ 35.

Here, a sentence at the high end of the Guidelines range for the conduct alleged in the Indictment, or 57 months, followed by a consecutive term of 24 months for the supervised release violation, leads to a term of 81 months. This is just shy of twice the 42-month term the Court imposed for the Section 922(g)(1) conviction in the prior case. This increase in punishment represents a measured and appropriate escalation in the length of incarceration, particularly considering the failure of other prior terms of imprisonment to prevent additional criminal conduct. That sentence will serve as specific deterrence through incapacitation, and if the Court confines its consideration of the Section

UNITED STATES' SENTENCING MEMO                    4
24-CR-0592 JSW; 21-CR-0251 JSW

3553(a) factors only to the current offense and the uncontested facts in the Presentence Report, an 81-month term is sufficient, but not greater than necessary to meet the goals of sentencing.

**ADDITIONAL SENTENCING CONSIDERATIONS**

Although a term at the high end of the Guidelines would be appropriate if only considering the facts of the offense, the Court is not so confined at sentencing.

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3166; *see also* U.S.S.G. § 1B1.4 ("In determining the sentence to impose, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.") (citing Section 3166).  The standard for considering a factor that enhances a sentence is whether it meets the preponderance of the evidence.  *United States v. Lucas*, 101 F.4th 1158, 1163 (9th Cir. 2024) (en banc).

As the PSR indicates, there is evidence that five days before he possessed the firearm in this case, the Defendant was involved in a homicide during a community basketball game in Oakland.  PSR ¶¶ 13-14.  There is no dispute that a shooting was captured on video or that a man was killed; the critical question—and the fact to which the Defendant objects—is whether Defendant Pittman is the shooter. *See* PSR at p. 26 (Addendum / Defense Objection ¶ 6).[1]

To address this question, the government is manually filing the videos showing this killing and the events that led up to it.  If the Court finds by a preponderance of the evidence that the videos establish that Defendant Pittman is the person who opened fire on the victim, the Court can take that fact into consideration in determining an appropriate sentence.

**The June 23, 2024 Homicide**

On afternoon of June 23, 2024, a community basketball game was being held near 996 44th St. in Oakland.  A gunfight broke out between two groups on the street outside the game, with dozens of

---

[1] There is also no dispute that DNA testing of spent shell casings found where the shooter opened fire at the victim show strong support for the exclusion of Defendant Pittman from the DNA that was found on those casings.  PSR ¶ 14.  Likewise, there is no dispute that those casings are a different caliber than the weapon at issue in this case.  PSR ¶ 14.

rounds fired.  Two people were shot, one fatally.

The shooting was recorded on two security cameras, and the government submits that the footage indicates that Defendant Pittman is the person who shot and killed the victim, Robert Ortega. This is based on several factors.  The shooter was wearing a cross-body bag during the shooting, and he likely stored his gun inside it.  Five days later, Defendant was wearing just such a bag prior to his arrest, and when he saw officers approaching the car, he threw the bag in the back seat.  ECF 1 ¶¶ 10, 12 (Criminal Complaint).  When officers seized it, they found a firearm inside, loaded with an extended magazine.  *Id.* ¶ 12.  Defendant and the shooter share a similar height, have a similar build, have a similar hairstyle, and wear similar glasses.

The videos from the security cameras are not lengthy, but the government provides the following guide for the Court's review.  The video labeled "Video 1" shows the scene where the gunfight broke out.  It also shows Defendant Pittman shooting at the victim as the victim exited a car after the initial exchange.  The video labeled "Video 2" shows the area to the left of the vantage point of Video 1, and it shows Defendant Pittman firing down the street toward the area in Video 1.  Video 1 then shows the victim collapsing in the street after this second volley of bullets.  The notations of time below indicate the time provided by the video player and on a timestamp within each video.

**Footage from Video 1**

- 12:40 on the video player / 06:12:40 pm on the header in the video

The Defendant—in a white shirt and wearing a cross-body bag—and another person also in a white shirt begin walking across the street from the left side of the screen.

- 13:05 / 06:13:06 pm

The two individuals stop in front of a white Prius in the mid part of the frame.

- 16:40 / 06:16:42 pm

The gunfight begins, described in more detail below.

- 17:07 / 06:17:07 pm

The Defendant runs off screen to the right.

**Footage from Video 2**

- 0:25 on the video player / 17:16:50 on the header in the video

UNITED STATES' SENTENCING MEMO                    6
24-CR-0592 JSW; 21-CR-0251 JSW

Vehicles in the frame start speeding away from the scene from left to right, likely because of gunfire coming from the left.

- 0:48 / 17:17:10

A person from the shooting arrives in view running from the left, followed by the Defendant.

**Footage from Video 1**

- 17:17 / 06:17:18

A dark colored Mercedes SUV that had earlier been parked near the site of where the shooting began speeds back into view from left to right.

**Footage from Video 2**

- 1:03 / 17:17:25

The SUV arrives from the left; the Defendant opens fire, gets in the SUV, and the vehicle speeds off from left to right.

**Footage from Video 1**

- 17:23 / 06:17:23 (simultaneous with 1:00 / 17:17:22 of Video 2)

A person—the victim who later died—staggers into the street and then drops to the ground. He then gets up, returns to his car, goes back into the street, and kneels down, eventually collapsing as people begin to attend to him.

**Screenshots from the Videos**

The initial screenshot below shows two people, one with a cane, standing outside a Mercedes SUV parked on the street. Behind them there are two other individuals in front of a white Prius, one standing more toward the camera with something in his hands, and the other facing that person and wearing a cross-body bag. There is also a black Honda two-door sedan parked in the driveway in the top center of the frame and a black BMW sedan on the right.

UNITED STATES' SENTENCING MEMO    7
24-CR-0592 JSW; 21-CR-0251 JSW



Something then happens between the two men in the rear of the scene, and the person in the white shirt without the bag begins to run toward the back of the white Prius.



The surveillance footage then shows the person behind the Prius open fire on the man he was talking to and the individuals near the Mercedes SUV. Those people duck, and the person who was initially talking to the man in the white shirt starts moving toward the direction of the camera and behind the Mercedes. A cross-body bag is visible on his chest. The government submits that this is Defendant Pittman.

The individual with the cane behind the Mercedes returns fire, and Defendant, now with a pistol in his right hand, moves back toward the rear of the SUV. A person is down on the ground, likely after being hit by a bullet.



The person who had the cane then runs down the street away from the Mercedes, firing over his shoulder as he does so. Pittman, meanwhile, moves to the rear of the Honda, with his weapon pointed down.



At this point, the Prius begins to drive away, and Pittman moves toward the rear of the BMW.  The person with the cane has run down the street and out of view.



Pittman directs the people in the Mercedes to make a U-turn, and they begin to drive down the street.



As the Mercedes drives off, Pittman moves behind the BMW. In the video, his glasses and close-cropped hair are visible, and his firearm is held low in his right hand. At the same time, the person in the passenger seat of the black Honda—Robert Ortega—opens the door and rolls out to the right, moving quickly away from the car.



Pittman sees this movement and opens fire. The grey smoke from the gunshot is visible to the left of the weapon.



Moving to his right, Pittman continues to shoot. Two more puffs of smoke can be seen as he fires in the direction of the Honda passenger.



Pittman then runs off screen, following the person who had the cane.



Meanwhile, the Mercedes SUV had made its U-turn and begins speeding down the street.  At the same time, Mr. Ortega, visibly wounded, comes out from behind the bushes.  He is seen here at the right rear of the Honda, heading for the street.



He then staggers into the street after the Mercedes passes him.



Down the street, Pittman looks back, sees the Mercedes coming, and begins moving toward it.  It stops to pick him up.  As he approaches the car, he notices Mr. Ortega in the street.  He then raises his pistol and opens fire again as he moves to the back of the car and gets in.









As soon Pittman fires, Mr. Ortega drops to the ground.





Immediately after Pittman gets in the back, one of the individuals standing near the SUV before the shots were fired gets in the front passenger seat of the Mercedes. It then picks up the person with the cane further down the street, and it speeds off.

Although the cameras that captured this killing are not close to the action, the shooter bears a striking resemblance to Defendant Pittman. When he was arrested, he was in possession of a cross-body bag that looks just like the one in the video, seen here on the officer who seized it from Pittman's car.





UNITED STATES' SENTENCING MEMO          20
24-CR-0592 JSW; 21-CR-0251 JSW



The similarities between the bags are apparent.







Another item of significance is the shooter's footwear—white mid- to high-top basketball shoes worn with the tongue in front of the pant leg.











Defendant Pittman was wearing the same footwear, in the same style, when he was arrested five days later.







The similarities in build, height, hairstyle, and glasses are also evident from the arrest and the shooting footage.



While the defense has argued that this is insufficient evidence to establish liability for the June 23, 2024 killing, the Court may find that these points of connection meet the preponderance of the evidence standard. In that case, the Court can consider them in determining a sentence for possession of a firearm with an extended magazine five days after this killing.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that if the Court limits its consideration to the fact of the offense conduct and the Defendant's criminal history, that it sentence Defendant Joshua Pittman to a term at the high end of an adjusted offense level of 17 and a CHC of V, or 57 months, followed by a consecutive term of 24 months for the supervised release violation, a $100

//

//

//

//

//

special assessment, and three years of supervised release, and that it order forfeiture of the firearms and ammunition found in Defendant's car.

DATED: January 20, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/ *Kevin J. Barry*

KEVIN J. BARRY
Assistant United States Attorney